IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                         Plaintiff,<br><br><br>         vs.<br><br><br>JEFFREY F. GEDDES,<br><br>                    Defendant. | MEMORANDUM OPINION AND ORDER<br><br><br><br><br>Case No. 2:06 CR 726 |

During a May 6, 2005 interview with special agents of the Federal Bureau of
Investigation (FBI) at the office of Adagio (a business owned by Defendant Jeffrey Geddes), Mr.
Geddes allegedly made incriminating statements.  Mr. Geddes now argues that his rights, as
articulated in Miranda v. Arizona, 384 U.S. 436 (1966), were violated during the interview.
Additionally, Mr. Geddes argues that any incriminating statements that he made were
involuntary.

The court concludes that Mr. Geddes was not in custody during the interrogation, and
therefore the investigators were not obliged to read him his Miranda rights.  Additionally, Mr.
Geddes' statements were voluntary.  Accordingly, Mr. Geddes' motion is denied.

**FACTS**[1]

---

[1]The facts are taken from the transcripts of two evidentiary hearings held on August 24
and September 19, 2007.

On May 6, 2005, the FBI executed a search warrant at Adagio, a business located in Salt Lake City, Utah. Approximately ten agents, including Special Agent Steve Whittle, arrived between 9:00 a.m. and 10:00 a.m. (during business hours) and entered the unlocked doors of Adagio. Special Agent Brent Robbins, the case agent, arrived soon after.

Both Brent Robbins and Steve Whittle are experienced FBI agents. Agent Whittle has been an FBI agent for sixteen years, and he investigates mainly economic crimes. Agent Whittle was assisting Agent Robbins on the case. Agent Robbins (who is now retired from the FBI) worked for the FBI for almost thirty years, and has investigated hundreds of economic crimes.

Upon entering Adagio, the agents identified themselves as FBI agents to the approximately ten employees who were there. (Some agents wore blue jackets with the letters "FBI" on front and back, but other agents wore street clothes with badges on their shirts or belts. Of the agents who had weapons, the weapons were concealed and were not drawn at any point during the search.) The agents asked the employees to gather in a conference room so that they could describe what was happening and identify the employees. Afterwards, the employees were allowed to remove any personal items (with an agent escort) and were free to leave Adagio.

Mr. Geddes (whom Agent Whittle knew by sight) was also there, sitting at his desk in his office. Mr. Geddes' office, as well as several of the other offices, had glass walls with a view into the office common area and a view outside the building. (See Pl.'s Exs. 5, 6, 3.)

Agent Whittle approached Mr. Geddes in Mr. Geddes' office (which was near Adagio's entrance), identified himself, and asked Mr. Geddes to step away from the desk. Agent Whittle explained that the FBI was there to conduct a warrant-authorized search of the Adagio office.

2

Agent Whittle testified that they sat down and Mr. Geddes' office door was open.  Agent Whittle told Mr. Geddes: "Jeff, you're free to leave.  Jeff, you are not under arrest.  And, Jeff, you do not have to answer any questions.  However, I would like you to stay because the case agent, who is Agent Robbins, would like to explain what we're doing and why we are here."[2] (Transcript of Aug. 24, 2007 Evidentiary Hearing (hereinafter "Aug. Tr.") at 16.)  Mr. Geddes replied that he would wait to talk to Agent Robbins because he wanted to know why the FBI was there.  Agent Whittle never displayed a weapon, and never handcuffed or searched Mr. Geddes.

Mr. Geddes asked Agent Whittle if he should contact an attorney, but Agent Whittle replied that he could not give advice on that matter.  Mr. Geddes was free to use his cellular phone, and he did so to contact his business attorney.  Agent Whittle left Mr. Geddes' office while Mr. Geddes spoke to his attorney.[3]  The conversation lasted approximately one minute.

When Agent Whittle saw that Mr. Geddes' call had ended (he watched through the glass partition), he went back into Mr. Geddes' office to wait.  Four to five minutes later, Agent Robbins came into Mr. Geddes' office and joined Mr. Geddes and Agent Whittle.  Most of the

---

[2]Mr. Geddes points out that Agent Whittle's statements to Mr. Geddes were not included in the FBI's 302 report.  In this case, Agent Robbins wrote the 302 report and Agent Whittle testified that he merely signed off on the accuracy of Agent Robbin's report.  (See Aug. Tr. at 43.)  Accordingly, the court finds that Mr. Geddes' point does not diminish Agent Whittle's credibility.

[3]Michael Spence, Mr. Geddes' business attorney, testified that Mr. Geddes telephoned him sometime either in the late morning or afternoon.  (Transcript of Sept. 19, 2007 Evidentiary Hearing (hereinafter "Sept. Tr.") at 7.)  Regardless of the exact timing, Mr. Geddes' call to Mr. Spence occurred while law enforcement officers were at Adagio executing the search warrant.  Mr. Spence told Mr. Geddes that he could not speak with him because Mr. Geddes needed a criminal defense attorney and Mr. Spencer had a conflict of interest.

employees had left Adagio by this time.

Agent Robbins explained to Mr. Geddes why the FBI was there and asked Mr. Geddes if he would be willing to talk.  Mr. Geddes agreed.  Both Agent Whittle and Agent Robbins testified that Mr. Geddes was professional, cordial, helpful, friendly, articulate, and gave answers to the questions he was asked.  Mr. Geddes and the agents referred to each other by their first names.  Neither agent made threats, offered any inducements, or used coercion or physical force at any time.

A photograph introduced during one of the evidentiary hearings is particularly telling.  It shows Agents Whittle and Robbins casually sitting in business attire on a couch facing Mr. Geddes, who appeared relaxed and casually sitting on the opposite couch, with a table between the two couches.  The demeanor of the agents and Mr. Geddes is relaxed and shows cooperation, not coercion.  (See Pl.'s Ex. 5.)

The interview lasted between one and two hours and ended before noon.  The agents then asked Mr. Geddes to leave while they continued the search.

Mr. Geddes left for awhile and returned around 3:00 p.m.  At that time, Mr. Geddes told the agents that he was looking for a ride home because his vehicles had been seized.  Agent Whittle suggested he call a taxi, but Mr. Geddes said he did not have access to funds because it appeared to him that all his bank accounts were frozen.  Agent Whittle offered to give Mr. Geddes a ride home to Park City.  Mr. Geddes accepted and sat in the passenger seat while Agent Whittle drove him home.

**ANALYSIS**

Mr. Geddes argues that all incriminating statements obtained by investigators must be suppressed because (1) the investigators failed to inform Mr. Geddes of his <u>Miranda</u> rights before questioning him, and (2) his confession was involuntary.[4]

**I.     Mr. Geddes' <u>Miranda</u> Rights Were not Violated Because He Was Not in Custody During the Interview.**

As stated by the Tenth Circuit, "<u>Miranda</u> requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"   <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993) (quoting <u>Miranda</u>, 384 U.S. at 444).  Before <u>Miranda</u> is implicated in any given situation, two requirements must be met: (1) the individual being questioned must be "in custody"; and (2) the questioning must amount to "interrogation," as those terms have been defined in relevant case law.   <u>See Miranda</u>, 384 U.S. at 444; <u>see also</u> <u>United States v. Hudson</u>, 210 F.3d 1184, 1190 (10th Cir. 2000).

It is undisputed that Mr. Geddes was not read his <u>Miranda</u> rights at any point during his interview at the offices of Adagio.  Nor is there a dispute that he was interrogated.  The primary question here is whether Mr. Geddes was "in custody" when questioned by the investigators.

The United States Supreme Court has held that one is in custody for <u>Miranda</u> purposes if that individual is "deprived of . . . freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444.  "The Court has also stated that the safeguards prescribed by <u>Miranda</u> become applicable

---

[4]In Mr. Geddes' motion to suppress, he argues that he was denied access to counsel before the agents questioned him.  But there is no record evidence to support Mr. Geddes' argument.  Mr. Geddes asked Agent Whittle whether he should contact an attorney and Agent Whittle replied that he could not give him advice on that matter.  Furthermore, Mr. Geddes did use his cell phone to contact his business attorney, Mr. Spence.

as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"
Perdue, 8 F.3d at 1463 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).
To determine if a person was in custody for Miranda purposes, courts assess whether "a
reasonable [person] in the suspect's position would have understood his situation . . . as the
functional equivalent of formal arrest."  Berkemer v. McCarty, 486 U.S. 420, 442 (1984).

"The determination of custody, from an examination of the totality of the circumstances,
is necessarily fact intensive."  United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993).  The
Tenth Circuit has articulated certain factors relevant to a determination of custody: "First, the
extent to which the suspect is made aware that he or she is free to refrain from answering the
questions or to end the interview at will often defines the custodial setting."  Id.  Second, the
nature of the questioning is also important: "Where the nature of the police/citizen encounter
progresses beyond a short investigatory stop, a custodial environment is more likely."  Id.  Third,
whether the situation is "police dominated" is important:

> Where police are in full control of the questioning environment, custody is more
> easily found.  Circumstances might include: separation of the suspect from family
> or colleagues who could offer moral support; isolation in nonpublic questioning
> rooms; threatening presence of several officers; display of a weapon by an officer;
> physical contact with the subject; and an officer's use of language or tone of voice
> in a manner implying that compliance with the request might be compelled.

Id. at 1518-19.  With these factors in mind, the court considers Mr. Geddes' motion.

The record evidence indicates that a reasonable person in Mr. Geddes' situation would
not have considered his freedom curtailed to a degree associated with formal arrest.  Mr. Geddes'
freedom was not sufficiently restrained to render him "in custody" for the purposes of Miranda.
No agent displayed a weapon while the FBI agents searched Mr. Geddes' offices.  Agent Whittle

showed Mr. Geddes his FBI credentials and told him that the FBI were there to execute a federal search warrant.  Mr. Geddes was interviewed in his office with the door open.  Moreover, Mr. Geddes' office had glass walls with a view in and outside of the offices.  (See Pl.'s Ex. 5.)

Mr. Geddes was also told that he was free to leave at any time.  Agent Whittle testified that he told Mr. Geddes that he was not under arrest: "Jeff, you're free to leave.  Jeff, you are not under arrest.  And, Jeff, you do not have to answer any questions."  (Aug. Tr. at 16 (emphasis added).)  Mr. Geddes was neither searched nor handcuffed.  The interview lasted between one and two hours and centered around the alleged crime.  Mr. Geddes was not physically constrained and as soon as the interview was over, Mr. Geddes left Adagio (indeed, the agents asked him to leave so they could fully conduct the search).[5]  Moreover, Mr. Geddes had his cell phone on him throughout the execution of the search warrant and he was able to use it, which he did when he contacted Mr. Spence.  Throughout the execution of the warrant the atmosphere was friendly and professional.

Despite Mr. Geddes' argument about Agent Whittle's competence as a witness, the court finds Agent Whittle a credible witness.  Mr. Geddes argues that Agent Whittle is not credible for a number of reasons.  First, he notes that Agent Whittle's statements to Mr. Geddes were not included in the FBI's 302 report.  But as previously discussed, Agent Robbins wrote the report and Agent Whittle merely signed off on its accuracy.  Mr. Geddes also argues that Agent Whittle

---

[5]Mr. Geddes contends that he was "confined in his office" (Def.'s Mem. Supp. at 10), but that assertion is contradicted by the record.  Mr. Geddes was told that he could leave at any time.  The door to his office was open.  He was not physically restrained, and there was no evidence of any psychological coercion.  And he was not ordered to stay either.

is not credible because his testimony about the number of flat-screen televisions in the office was not correct, as demonstrated by the testimony of an employee.  That is, Agent Whittle testified during direct examination that there were numerous flat-screen televisions at Adagio, and, during cross-examination, he testified that there were two televisions.  (Id. at 34.)  But an employee testified that there was only one television and it was in the conference room.  (Sept. Tr. at 15.)[6] The court finds this to be a trivial fact that does not negate the court's finding that Agent Whittle was a competent and credible witness.

Mr. Geddes also raised concerns about Agent Whittle's memory regarding whether Mr. Geddes was in the conference room or in his office when Agent Whittle entered Adagio.  But Agent Whittle conceded that he cannot remember for sure whether Mr. Geddes was ever in the conference room.  (See Aug. Tr. at 36-37.)  The court also finds this to be a minor fact that does not cast doubt on Agent Whittle's credibility.  Furthermore, there is no evidence contradicting the material parts of Agent Whittle's testimony.

Mr. Geddes also contends that there was a "police dominated atmosphere."  In support, Mr. Geddes points out several facts.  First, Mr. Geddes argues that his employees were ordered around by the agents.  But Mr. Geddes' employees were only told to come into the conference room to listen to the agents explain why they were there and to identify the employees.  Afterwards, the employees were told that they could retrieve their personal items and leave.

Second, Mr. Geddes argues that the presence of ten agents wearing "raid jackets,"

---

[6]From the pictures entered as exhibits, it also appears that there are additional flat-screen monitors located at desks within the office.  (See Pl.'s Exs. 1-6.)

firearms, and law enforcement credentials around their necks created a "police dominated atmosphere." But Agent Whittle testified that the agents wore the blue windbreaker jackets with the FBI letters on the front and back for officer safety and identification purposes. Moreover, Agent Whittle testified that no weapons were displayed because it was a "low risk type search warrant." (Id. at 9.)

Mr. Geddes also points out that he was ordered away from his desk when the agents entered Adagio. But Agent Whittle testified that the purpose of asking Mr. Geddes to step away from his desk was for safety reasons and because he "didn't want him [Mr. Geddes] to upset anything on his computer." (Id. at 15.) Clearly the agents were in control of the situation, but that is not enough to support a finding that Mr. Geddes was subjected to a police-dominated atmosphere that resulted in a custodial interrogation.

Given the totality of the circumstances, the court finds that Mr. Geddes was not in custody. Accordingly, his claim that his incriminating statements were obtained in violation of Miranda has no force.

## II.   The Absence of Coercive Investigator Activity Renders Mr. Geddes' Incriminating Statements Voluntary.

Mr. Geddes argues that, even if his Miranda rights were not violated, his statements should nevertheless be suppressed because they were the product of police coercion and therefore were involuntary. "To be admissible, a statement or confession made by a defendant to law enforcement officers must be voluntary." United States v. Aranda-Flores, 313 F. Supp. 2d 1188, 1200 (D. Utah 2004).

9

When assessing whether statements were voluntary, "the test is whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Erving L., 147 F.3d 1240, 1248-49 (10th Cir. 1998). The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986). The Tenth Circuit has identified the following factors to consider when making a voluntariness assessment: "(1) the age, intelligence, and education of the defendant; (2) the length of any detention; (3) the length and nature of the questioning; (4) whether defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." Erving L. at 1249.

In this case, Mr. Geddes is an adult and there is no evidence indicating that he suffers any mental disability or lacks education. The length of the interview at the office was somewhere between one and two hours and centered around the alleged crime. The investigators did not advise Mr. Geddes of his Miranda rights, but he was told that he was not under arrest and was free to leave at any time. Mr. Geddes was not subjected to physical punishment of any kind.

The atmosphere surrounding Agent Whittle's and Agent Robbin's interview of Mr. Geddes was relaxed. They referred to each other by their first names. The interview took place in Mr. Geddes office, which had glass walls, and the door was left open. Finally, there is no evidence that Mr. Geddes was deceptively offered any promise of leniency in exchange for his confession or cooperation. Nor is there any evidence that Mr. Geddes was threatened with any penalty. Considering the totality of the circumstances, the investigators did not coerce Mr.

Geddes into making incriminating statements.

## **ORDER**

For the foregoing reasons, Mr. Geddes' Motion to Suppress is DENIED.

DATED this 19th day of December, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge